## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHEN DISTRICT OF OHIO
## WESTERN DIVISION

| | | |
|---|---|---|
| SANDRA SCHROEDER, | : | Case No. 1:11-CV-02279 |
| Plaintiff, | : | |
| vs. | : | |
| COMMISSIONER OF SOCIAL SECURITY, | : | **MAGISTRATE'S REPORT AND RECOMMENDATION** |
| Defendant. | : | |

### I. INTRODUCTION.

Pursuant to 42 U. S. C. § 405(g), Plaintiff seeks judicial review of Defendant's final determination denying her claim for Disability Insurance Benefits (DIB) under Title II of the Social Security Act (Act).  Pending are the cross-Briefs of the parties and Plaintiff's Reply (Docket Nos. 15, 18 & 19).  For the reasons set forth below, the Magistrate recommends that the Court affirm the Commissioner's decision.

### II.  PROCEDURAL BACKGROUND.

On October 27, 2006, Plaintiff completed an application for DIB, alleging that she became unable to work because of her disabling condition on August 15, 2006 (Docket No. 13, pp. 178-180 of 731).  The application for DIB was denied initially and upon reconsideration (Docket No. 13, pp.

156-158; 163-166; 167-169 of 731). At the hearing conducted on October 10, 2009, before Administrative Law Judge (ALJ) Alfred V. Lucas, Plaintiff, represented by counsel, and Dr. Hershel Goren, a Medical Expert (ME) appeared and testified (Docket No. 13, p. 97 of 731). During the supplemental hearing conducted on March 11, 2010, Plaintiff, represented by counsel, and Vocational Expert (VE) Evelyn Sindelar, appeared and testified (Docket No. 13, pp. 19, 37 of 731). On March 26, 2010, the ALJ rendered a decision and concluded that Plaintiff was not entitled to a period of disability and DIB (Docket No. 13, pp. 16-31 of 731). The ALJ's decision became the final decision of the Commissioner when the Appeals Council denied review of the ALJ's decision on August 24, 2011 (Docket No. 13, pp. 5-7 of 731). Plaintiff filed a timely Complaint in this Court seeking judicial review of the Commissioner's decision denying benefits (Docket No. 1).

## II. FACTUAL BACKGROUND.

### 1. THE INITIAL HEARING
#### a. PLAINTIFF'S TESTIMONY.

**DEMOGRAPHIC PROFILE.** Plaintiff was 45 years of age, 5'2" tall and weighed 160 pounds. She had a high school education and had pursued a license to become a nail technician (Docket No. 13, pp. 99, 101 of 731). She had recently moved to a new address and she had no car (Docket No. 13, p. 100 of 731). Having exhausted the proceeds from a lump sum divorce settlement, Plaintiff relied upon her sister and free healthcare for her support. Plaintiff was a food stamp recipient (Docket No. 13, pp. 128, 129 of 731).

**EMPLOYMENT HISTORY.** Plaintiff was last employed in August 2006 at Community Health Partners. As an administrative assistant, Plaintiff performed typing, filing and scheduling appointments. Plaintiff estimated that she alternated equally between sitting and standing. October 15, 2012Occasionally she had to assist the physician lift patients (Docket No. 13, pp. 101-102 of

2

731).

Plaintiff also managed a day-care program in her home.  Typically she cared for no more than three children aged three to four years on a part-time basis (Docket No. 13, p. 103 of 731).

Plaintiff performed a number of services for friends.  Most were short-lived.  At a meat company, Plaintiff waited on customers and cut meat, occasionally lifting fifty pounds.  At an office building, Plaintiff performed janitorial services.  As an accounts receivable clerk for a trucking firm, Plaintiff occasionally lifted files and invoices but primarily collated invoices and receipts and filed documents.  Plaintiff was given temporary work assignments at Giant Eagle and a physician's office (Docket No. 13, pp. 104-105; 106-107 of 731).

IMPAIRMENTS.  Generally, Plaintiff underwent a hysterectomy, gallbladder surgery and elbow surgery to relieve tendonitis; however, she was undergoing treatment for day-to-day medical problems which included anxiety/depression, fibromyalgia, irritable bowel syndrome, migraines, and "sleep problems" (Docket No. 13, pp. 107-109 of 731).

ANXIETY/DEPRESSION--Plaintiff had a 20-year history of anxiety and she was depressed most of the time.  Admittedly, the symptoms of depression were exacerbated by life stressors (Docket No. 13, pp. 111, 122, 123 of 731).  She cried a couple of times per week and she felt nervous every day (Docket No. 13, pp. 122, 123).  Plaintiff isolated herself from people.  Her memory or lack thereof, affected her ability to remember appointments or items she needed at the store.  Plaintiff's inability to focus affected her ability to balance her checkbook, read books without distractions or follow a television program (Docket No. 13, pp. 123, 124, 125 of 731).

FIBROMYALGIA.  Dr. Digna Moya, a family practitioner, was the first to diagnose Plaintiff with fibromyalgia.  This diagnosis was confirmed by Dr. Daniel J. Holden, a rheumatologist.

3

Plaintiff's pain management physician addressed Plaintiff's fibromyalgia symptoms (Docket No. 13, p. 130 of 731).  The more severe pain was in her shoulders and neck area.  Apparently, that pain radiated to the middle of her back.  However, she also had bilateral, persistent pain in her hips and thighs.  The degree of persistent pain varied from mild to moderate (Docket No. 13, pp. 110-111 of 731).  Plaintiff suffered from numbness and tingling in her hands.  Diagnosed with carpal tunnel syndrome, Plaintiff's pain management physician correlated the numbness and tingling in her hands to her neck problems (Docket No. 13, p. 117 of 731).

MIGRAINES--Plaintiff's head hurt all of the time.  Plaintiff estimated that she had five or six migraine headaches monthly.  The headaches could last for three or four days (Docket No. 13, p. 112 of 731).

IRRITABLE BOWEL SYNDROME--A viscous cycle of bowel problems prevailed.  After bouts of diarrhea once weekly, Plaintiff would suffer from constipation (Docket No. 13, p. 116 of 731).  In addition, Plaintiff had chronic urinary tract infections and bladder control issues precipitated by sneezing or coughing (Docket No. 13, p. 130 of 671).

TREATMENT--To treat her symptoms, Plaintiff took muscle relaxers, morphine sulfate (an opiod that decreases the feelings of pain and reduces the emotional response to pain), Vicodin® (a pain reliever), Topamax® (a migraine prophylaxis), and Ambien® (a sleep aid).  The side effects of these medications included lethargy, tiredness, difficulty concentrating and diminished alertness (Docket No. 13, pp. 109, 129 of 731; www.webmd.com/pain-management/morphine-sulfate; www.drugs.com/vicodin; www.topamax.com).  In addition to drug therapy, Plaintiff secluded herself in a darkened room at the onset of a migraine headache.  Since she started taking Topamax®, her migraine headaches occurred less frequently (Docket No. 13, pp. 114-115 of 731).  When the

4

pain in her hip and thighs became unbearable, Plaintiff had to sit down, lie down or elevate her feet and legs (Docket No. 13, p. 112 of 731).

FUNCTIONAL LIMITATIONS--When asked about her functional limitations, Plaintiff who did not use a cane or crutches, suggested that she could:

1. Stand constantly for twenty minutes.
2. Walk for ten minutes
3. Sit without difficulty.
4. Walk down a few stairs.
5. Bend over and touch the middle of her shin.
6. Not bend over and touch the floor.
7. Lift a five-pound bag of potatoes or one gallon of milk (8. 6 pounds).
8. Lift her arms above shoulder level but not repeatedly.

(Docket No. 13, pp. 117, 118, 119, 130 of 731).

Plaintiff's functional limitations were affected by mopping, cleaning her shower and the cold weather (Docket No. 13, pp. 119, 120 of 731).  The range of motion of her head was good except that soreness resulted from moving her head from side to side.  Plaintiff's fingers swelled and the tingling was intermittent.  However, her ability to write, button larger buttons, pick up coins and tie her shoelaces were virtually unaffected by the numbness, pain and swelling in her hands (Docket No. 121, 122 of 731).

DAILY ACTIVITIES--During a typical day, Plaintiff fed and dressed herself.  She made small meals and engaged in light housekeeping.  Her daughter assisted her with cleaning, mopping and scrubbing and her son maintained the lawn.  Plaintiff did her own laundry and she shopped for groceries once or twice monthly (Docket No. 13, pp. 125, 126 of 731).  She seldom visited her children or her friends in their homes.  Her interests including bathing, feeding and otherwise caring for her dogs (Docket No. 13, pp. 126, 127 of 731).

b. THE ME'S TESTIMONY.

5

The ME explained that Dr. Holden, Plaintiff's treating rheumatologist, identified fibromyalgia, an organic disease that causes whole-body pain, including metastatic cancer (cancer that spreads from one organ to another). In the ME's opinion, Dr. Shaw, a treating anesthesiologist, learned that Plaintiff had whole body pain but there was no evidence of an organically determined disease that caused whole body pain, including metastatic cancer. The ME then reviewed the medical records that he considered in arriving at his conclusions, namely, that Dr. Shaw's treatment was normal but he did not do enough of an examination; that the social worker treated Plaintiff's major depressive disorder, that Dr. Smith considered the problems to be dysthymic and panic disorders, that Dr. Deluca thought Plaintiff was moderately impaired; that Dr. Omana made a diagnoses of major depressive disorder (MDD), panic disorder, and obsessive compulsive disorder; and that an unidentified treating social worker made a diagnosis of MDD. From the ME's reading of these records, Plaintiff did not meet or equal any listings; she would have restrictions in the workplace related to cervical disc degeneration, adjustment disorder, panic attacks and recurrent obsessions with restrictions of lifting and carrying twenty pounds occasionally, ten pounds frequently and no high production quotas, "by which I mean assembly line work and work at which she gets paid at a piece rate" (Docket No. 13, pp. 132-134 of 731; www.medical-dictionary.metastatic).

The ME noted that despite Dr. Shaw's recommendation, there was no medical reason for Plaintiff to elevate her legs during the workday. In fact, if Plaintiff had back pain, it was the ME's opinion that elevating the lower extremities would worsen the back pain (Docket No. 13, p. 134 of 731). The ME further noted that he disagreed with the recommendations that Plaintiff could stand for four hours or less. Such finding was inconsistent with the medical records (Docket No. 13, p.

135 of 731).  The ME also noted that none of Plaintiff's physicians had identified any disease that could cause problems with temperature extremes or fumes (Docket No. 13, p. 134 of 731).

Upon examination by Plaintiff's counsel, the ME explained that his testimony did not include a judgment about Plaintiff's credibility.  He noted that (1) there was no identifiable disease for which morphine was a treatment; (2) morphine by its very nature can cause drowsiness; and (3) Vicodin®, Topamax® and Ambien® could also cause drowsiness.  The combination of such medications could decrease attention or concentration (Docket No. 13, p. 137 of 731).

## 2. THE SUPPLEMENTAL HEARING.
### a.    PLAINTIFF'S TESTIMONY.

UPDATE.  Since the first hearing, Plaintiff lost her home and was virtually homeless.  She was receiving mail at her sister's home in Lorraine, Ohio, and sleeping at her sons' homes (Docket No. 13, p. 40 of 731).  Plaintiff had one dog for whose care she was responsible (Docket No. 13, p. 53 of 731).  Plaintiff received food stamps (Docket No. 31, p. 52 of 731).  Plaintiff's weight had fluctuated minimally.  Plaintiff had obtained a certificate for nail technology (Docket No. 13, pp. 41-42 of 731).

SUPPLEMENTAL EMPLOYMENT HISTORY.  Plaintiff added that she worked at a bridal shop in the capacity of salesperson and fitter.  Occasionally, she lifted bridal dresses that weighed 15 pounds.  The social security records showed that Plaintiff had worked at Tri-County Business Office; however, she did not remember working there (Docket No. 13, pp. 43-44 of 731).  Plaintiff worked at a trucking company for less than a year as an accounts receivable clerk (Docket No. 13, p. 45 of 731).  In addition, Plaintiff was temporarily assigned to Bendix Corporation, Honeywell. Her tasks were undetermined (Docket No. 13, p. 45 of 731).

MEDICAL CONDITIONS.  Plaintiff experienced chronic pain in her middle back, legs, hips,

7

shoulders and thighs. Cold weather aggravated her pain. Plaintiff claimed that her pain affected the ability to engage in repetitive reaching overhead, sitting for prolonged periods of time without shifting or standing on her feet "for a while" (Docket No. 13, pp. 49, 51, 54-55 of 731). Plaintiff was generally indisposed for three days when she got a migraine headache. Plaintiff continued to have a problem with constipation and diarrhea. Constipation resulted in stomach pain (Docket No. 13, p. 49 of 731). With respect to her exertional limitations, Plaintiff explained that she could not go up and down the stairs repeatedly. Plaintiff no longer purchased gallons of milk; she purchased smaller quantities. She could not walk and carry her new grandson (Docket No. 13, p. 51 of 731).

**MEDICAL TREATMENT.** Plaintiff continued to treat with a psychiatrist at the Nord Center, a not-for-profit organization serving the mental health needs of local residents. She obtained a medication adjustment every four to five months. She saw a counselor or therapist twice monthly (Docket No. 13, pp. 46-47 of 731; www.nordcenter.org).

During the month preceding the hearing, Plaintiff was prescribed Methadone, a pain reliever used as part of a drug addiction detoxification and maintenance program. Her doctor no longer prescribed Morphine and Vicodin®. She took Ambien® "on occasion." The identifiable side effects of her medications included drowsiness, dry mouth and forgetfulness. Even though the side effects of her medications included drowsiness, Plaintiff still had trouble sleeping the entire night (Docket No.13, p. 47 of 731; www.drugs.com/methadone.

**DAILY ACTIVITIES.** Plaintiff had two to three days per month that were "bad." She needed to be within close proximity to the bathroom (Docket No. 13, pp. 55-56 of 731).

**b.   THE VE'S TESTIMONY.**

First, the VE, a licensed social worker and certified case worker, categorized Plaintiff's work

history from 1994 to 2006 by exertional levels, skill levels and the amount of lapsed time required

for a typical worker to learn the techniques required to perform the job:

| Job | Exertional level of performance | Skill level | Specific Vocational Preparation |
|---|---|---|---|
| Receptionist | Sedentary-a job that involves sitting, lifting no more than 10 pounds and occasionally lifting or carrying articles | Semi-skilled-work that requires some skills, but not complex work duties. | 4-Over three months up to and including six months. |
| Child care | Light-a job that involves a good deal of walking or standing, lifting more than 20 pounds and frequently lifting or carrying objects weighing up to 10 pounds. | | 3-Over one month up to and including three months. |
| Shipping/Receiving | Medium-lifting no more than 50 pounds with frequent lifting up to 25 pounds. | Semi-skilled | 5-Over six months up to and including one year. |
| Sales | Light | Semi-skilled | 3-Over one month up to and including three months. |

(Docket No. 13, pp. 57-59 of 731).

Second, the ALJ asked that the VE assume a person of the same age, education and work

background who was impaired to the extent of Plaintiff's testimony.  The VE suggested that there

would no jobs which exist in significant numbers in the economy that she could do (Docket No. 13,

p. 59 of 731).

Third, the ALJ asked that the VE assume a person of the same age, education, and work

background and this person could perform work at a medium level but she had non-exertional

limitations.  She would need a job that was simple and repetitive and low stress with no high

production quotas.  The VE opined that she could perform work at the medium exertional level and

vocational preparation would exceed six months and could last up to and including one year.

Consequently, the hypothetical plaintiff could perform work as a shipping and receiving clerk and

receptionist (Docket No. 13, p. 59 of 731).

Fourth, the ALJ asked if the result would change if the hypothetical claimant could perform

a job that had a vocational preparation period that exceeded six months up to and including one year if relegated to simple, low stress work.  Because the stress level could be too high, the hypothetical plaintiff could not perform the work of shipping and receiving clerk or receptionist (Docket No. 13, pp. 59-60 of 731).  However, she could perform work that, at most, would require  vocational preparation for more than one month and up to and including three months (Docket No. 13, p. 60 of 731).

Fifth, changing the hypothetical question to a person who could perform work at the light level with the same kind of exertional limitations–low stress, simple repetitive and vocational preparation that included anything beyond a short demonstration and including one month–there is work that the hypothetical claimant could perform.  The recommended jobs are consistent in all respects with the DICTIONARY OF OCCUPATIONAL TITLES (DOT), a standardized occupational guidebook with specifications of employee qualifications.  In addition, the VE testified as to the attendant skill level and specific vocational preparation required for each job as well as the approximate available numbers of jobs:

| Job/Dot Number | Exertional/Skill Levels | SVP | Numbers of jobs available in NE Ohio/State of Ohio/US Economy |
|---|---|---|---|
| Gasket Inspector/ 739.687-102 | Light/Unskilled | 2-Anything beyond a short demonstration up to and including one month | 3,500/17,000/576,000 |
| Weld Inspector/724.685-014 | Light/Unskilled | 2 | 500/2,700/37,000 |
| Final Inspector for a light bulb/727.687-054 | Light/Unskilled | 2 | 2,500/13,700/224,000 |

The ALJ posed an additional hypothetical in which the identical hypothetical person with the same age, education and work background as Plaintiff who could:  (1) perform light work; (2) stand about four hours in an eight-hour workday but only one hour at a time; (3) sit four hours but only one hour at a time; (4) lift and carry twenty pounds occasionally and ten pounds frequently; (5)

not engage in fine finger manipulation and handling; (6) occasionally reach with either arm whether by extending her arm or her arm below her shoulder level; (7) occasionally work around hazardous machinery; (8) occasionally tolerate heat, cold, dust, smoke and fumes; and (9) elevate her legs for one hour. The VE opined that the aforementioned jobs would be appropriate because such jobs included a sit/stand option. In other words, the hypothetical claimant could stand at will and sit at will so long as he or she was doing their job. However, the need to elevate one's legs for an hour would be a consideration and the number of jobs that exist in significant number would change if an accommodation had to be made (Docket No. 13, p. 62-64 of 731; www.occupationalinfo.org). Plaintiff's counsel suggested that the hypothetical plaintiff could not perform the jobs described above because the reasoning development requirements exceeded Plaintiff's reasoning level (Docket No. 13, p. 68 of 731).

### III. MEDICAL EVIDENCE.

Under the Title II program, medical evidence is the cornerstone for the determination of disability. Each person who files a disability claim is responsible for providing medical evidence showing that he or she has an impairment and the severity of that impairment. 20 C. F. R. § 404.1512(c) (Thomson Reuters 2012). The medical evidence generally comes from sources that have treated or evaluated the claimant for his or her impairment. 20 C. F. R. § 404.1512(b) (Thomson Reuters 2012). A review of the sources that have treated and/or evaluated Plaintiff follow.

Plaintiff was treated at the KAISER BEHAVIORAL HEALTH FACILITY, on March 3, 2003, April 7, 2003, May 3, 2003, May 14, 2003, July 29, 2003, September 16, 2003, September 22, 2003, September 30, 2003, October 7, 2003, October 28, 2003 and May 20, 2005. Diagnosed with dysthymia (neurotic depression) and major depressive disorder (MDD), recurrent, Ms. McGowan,

11

a licensed independent social worker (LISW), Ms. Lise Moulton, LISW and Ms. Constance Baker, Academy of Certified Social Workers (ACSW), coordinated therapeutic interactions with Plaintiff to address marital, familial and financial stressors which evolved into symptoms of MDD and anxiety.  Treatment also included medication checks for the effectiveness of prescriptions such as Paxil®, a medication used for the treatment of MDD and panic disorder, and Wellbutrin®, an antidepressant (Docket No. 13, pp. 266-301 of 731; PHYSICIAN'S DESK REFERENCE, 2006 WL 371977, 2006 WL 372108 (Thomson PDR 2006)).

On September 14, 2005, Dr. Heather R. Scullin, D. O., a physical medicine and rehabilitation specialist, conducted a nerve conduction study or electrodiagnostic testing.  An abbreviated study was done as a courtesy to Plaintiff.  Nevertheless, the results showed mild borderline carpal tunnel syndrome (Docket No. 13, pp. 730-731 of 731; www.vitals.com/doctors/Dr_Digna_Moya.html; www.vitals.com/doctors/Dr_Heather_Scullin.html).

Plaintiff underwent an evaluation for physical therapy through UNIVERSAL THERAPY DYNAMICS.  She was evaluated on November 2, 2005 but failed to schedule appointments; consequently, Plaintiff was discharged from physical therapy (Docket No. 13, pp. 303-306 of 731).

Dr. Holden conducted a consultative examination on January 16, 2006.  He acknowledged that Plaintiff had cervical spondylosis with headache, fibromyalgia, paresthesias, left trapezius, left knees arthroscopic, carpal tunnel syndrome, degenerative disease lumbar spine, hypertension, depression and hyperlipidemia (Docket No. 13, p. 308 of 731).

Dr. Bharat Shah, M. D., an internal medicine and pain management specialist, confirmed prior diagnoses of degeneration of the lumbar or lumbrosacral intervertebral disc, cervical disc degeneration, cervical radiculitis/root compression and common migraine when Plaintiff presented

12

on March 2, 2006 with complaints of whole body pain. Dr. Shah employed a course of treatment that included prescribing a pain medication and then adjusted the medication for breakthrough pain dose reduction. The results from magnet resonance imaging (MRI) of Plaintiff's cervical spine that was ordered by Dr. Shah and performed on March 4, 2006, showed:

    (1)    the presence of cervical spondylosis which was worst at C5-C6;

    (2)    the presence of disc osteophyte complex; and

    (3)    no evidence of significant canal or foraminal stenosis.

Dr. Shah addressed Plaintiff's complaints of whole body pain on March 27, 2006 and April 24, 2006. Because Plaintiff complained that the pain had intensified but it was slowly subsiding, Dr. Shah began to wean Plaintiff from a pain medication that was administered cutaneously and instead prescribed morphine sulphate and Ambien®, a sleep medicine (Docket No. 13, pp. 331, 354-357, 358-359, 360-361, 365-366 of 731; www.vitals.com/doctors/Dr_Bharat_C_Shah.html; PHYSICIAN'S DESK REFERENCE, 2006 WL 387951 (Thomson PDR 2006)).

Plaintiff underwent a hysterectomy and bilateral removal of her fallopian tube and ovaries on May 9, 2006 (Docket No. 13, pp. 316-323 of 731). In response to Plaintiff's complaints of increased body pain, Dr. Shah continued the prescriptions for morphine sulphate on May 26, 2006. Then on July 10, 2006, Dr. Shah reviewed the results from a cervical MRI and scheduled a cervical epidural. For increased headache pain, Dr. Shah increased the dosage of Topamax® and Vicodin®, an opioid analgesic (Docket No. 13, pp. 367-369, 370-373 of 731; PHYSICIAN'S DESK REFERENCE, 2006 WL 384462, 2006 WL 354661 (Thomson PDR 2006)).

On August 14, 2006, Plaintiff presented to Dr. Moya with complaints of inflamed sinuses and fatigue. Dr. Moya attributed Plaintiff's fatigue to sleep or emotional problems. Buspar, an anti-anxiety medication, and Augmentin, an antibiotic, were prescribed (Docket No. 13, pp. 336-340 of 731; www.drugs.com/buspar.html).

On August 28, 2006, Dr. Shah provided temporary relief of Plaintiff's moderately severe headache and neck pain in anticipation that Plaintiff would undergo a cervical epidural steroid injection during the upcoming weeks.  Dr. Shah reduced the dosage of Topamax® because it was causing side effects such as numbness and tingling in Plaintiff's feet (Docket No. 13, pp. 374-376 of 731).

Dr. Osama Malak, M. D., did administer an epidural steroid injection on September 13, 2006 (Docket No. 13, pp. 377-378 of 731).  Dr. Malak noted that Plaintiff's headache and neck pain had greatly improved on September 27, 2006 (Docket No. 13, p. 379 of 731).

On September 18, 2006 and September 25, 2006, Dr. Moya addressed Plaintiff's state of anxiety, fatigue and fever.  Her sinus symptoms were resolved (Docket No. 13, pp. 341-344 of 731).

Plaintiff reported to Dr. Malak on September 27, 2006, that her headache had improved at 30% and her neck pain had improved 10%.  Dr. Malak prescribed Zanaflex, a short acting muscle relaxer, to control muscle spasms (Docket No. 13, pp. 379-381; www.drugs.com/zanaflex).

On October 25, 2006, Dr. Shah treated Plaintiff for intense headache and neck pain.  On October 26, 2006, Dr. Moya scheduled Plaintiff for the excision of a skin lesion that had changed in size (Docket No. 13, pp. 349; 383-384 of 371).

On October 19, 2006, Plaintiff presented to Dr. Jessica B. Wells, M.D., an internist and infectious disease specialist, with complaints of fever and fatigue which had plagued her since May 2006.  Dr. Wells diagnosed Plaintiff with subjective fever; otherwise, there was nothing of concern in Plaintiff's physical examination or history (Docket No. 13, pp. 333-334 of 731; www.healthgrades.com/physician/dr-jessica-wells-xh7nf).

On October 26, 2006, Dr. Moya noted signs of depression, anxiety, changes in sleep pattern, hyperlipidemia and moodiness.  Dr. Moya discontinued Plaintiff's prescriptions for Augmentin, an

14

antibiotic, Topamax® and Zithromax, an antibiotic (Docket No. 13, pp. 350-351 of 731; PHYSICIAN'S DESK REFERENCE, 2006 369202, 384617 (Thomson PDR 2006)).

On November 16, 2006, Plaintiff reported to Lori Arnett-Beckwith, R.N., that her pain level was controlled by her medications.  The nerve block had provided moderate relief (Docket No. 13, p. 386 of 731).

On December 21, 2006, Dr. Shah intervened to manage Plaintiff's pain.  A new medication was prescribed even though Plaintiff reported decreased headaches.  On January 19, 2007, Plaintiff reported to Dr. Shah that her headaches and neck pain were increasing (Docket No. 13, pp. 422 of 731).

Plaintiff was treated for stomach pain on January 5, 2007, at the EMH Regional Medical Center (EMHRHC) (Docket No. 13, pp. 458-463 of 731).  The computed tomography scan (CAT) of the abdomen showed possible appendicitis (Docket No. 13, pp. 467 of 731).  The frontal view of the abdomen showed prominent bowel loops in the upper left quadrant but no obstruction (Docket No. 13, p. 469 of 731).

Clinical psychologist, Dr. Ronald G. Smith, Ph. D., conducted an interview on January 25, 2007.  Plaintiff was lucid, aware of her surroundings and fully oriented.  Plaintiff 's ability to maintain attention and concentration was fair at times but was disrupted and impaired by chronic pain and depression.  Based on the records and his interview, Dr. Smith adopted the diagnoses of dysthymic disorder (in partial treatment remission), panic disorder without agoraphobia (in partial treatment remission) and fibromyalgia with body aches, deep muscle pain and migraine headaches.  He noted that Plaintiff was dealing with a variety of physical discomforts and pain.  Dr. Smith assessed Plaintiff's current global assessment of functioning at 55, a score which denotes moderate symptoms

(ex: flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (ex: few friends, conflicts with peers/co-workers) (Docket No. 13, pp. 387-391 of 731; www.healthgrades.com/provider/ronald-smith-xyn4r).

On February 7, 2007, Dr. Bruce Goldsmith, Ph. D., a psychologist, completed two forms:  a PSYCHIATRIC REVIEW TECHNIQUE FORM (PRT) and a MENTAL RESIDUAL FUNCTIONAL CAPACITY ASSESSMENT (MRFC).  In the PRT, Dr. Goldsmith opined that Plaintiff's medical diagnoses from August 15, 2006 to February 7. 2007, included an affective disorder, an anxiety related disorder and a panic disorder.  The degree of limitations that existed as a result of these mental impairments was mild in the areas of restriction of activities of daily living and difficulties in maintaining social functioning and moderate in the area of difficulties in maintaining concentration, persistence or pace. There were no documented episodes during which Plaintiff was maintaining her mental illness and then there was a temporary worsening of her symptoms and a loss of function as a result (Docket No. 13, pp. 393-403 of 731; www.healthgrades/com/provider/burce-goldsmith-28tpd).

In the MRFC, Dr. Goldsmith found that Plaintiff was moderately limited in the ability to maintain attention and concentration for extended periods, the ability to complete a normal work day and work week without interruptions from psychologically based symptoms and the ability to respond appropriately to changes in the work setting.  It was Dr. Goldsmith's opinion that Plaintiff was only partially credible and that she was capable of performing routine tasks (Docket No. 13, pp. 407-409 of 731).

Dr. Moya recommended that Plaintiff see an ear, nose and throat specialist to address the lump in her throat.  Although Plaintiff's white blood count was elevated, the results from the final blood culture taken on January 30, 2007, were negative for abnormality (Docket No. 13, pp. 475-476 of

16

731).  Medical consultant, Dr. Walter Holbrook, M. D., completed a PHYSICAL RESIDUAL FUNCTIONAL CAPACITY ASSESSMENT on February 10, 2007.  Based on all the evidence in the file, it was Dr. Holbrook's reasoned judgment that Plaintiff had no communicative, environmental, manipulative, postural or visual limitations.  Plaintiff did have the following limitations imposed by her symptoms:

1   Lift and/or carry fifty pounds occasionally
2.  Lift and/or carry twenty-five pounds frequently
3.  Stand and/or walk with normal breaks, for a total of six hours in an eight-hour workday.
4.  Sit with normal breaks for a total of about six hours in an 8-hour workday.
5.  Unlimited pushing and/or pulling, including operation of hand and/or foot controls.

(Docket No. 13, pp. 412-416 of 731).

Dr. Kenneth A. Deluca, Ph.D., a psychologist, reported that he had treated Plaintiff a total of four times, on March 6, 2007, March 13, 2007, May 21, 2007 and June 13, 2007.  He noted that Plaintiff's mood was generally anxious and she displayed tenseness, nervousness and restlessness. Dr. Deluca further opined that Plaintiff could not handle stress well and she had a short attention span. Plaintiff was compliant with the treatment plan and there were no behavioral difficulties (Docket No. 13, pp. 492-496 of 731).

On March 7, 2007, Dr. Shah administered a cervical epidural steroid injection (Docket No. 13, p. 429 of 731).

On March 13, 2007, Plaintiff was admitted to the EMHRMC to resolve complaints of chest pain (Docket No. 13, pp. 434-443 of 731).  Results from the chest X-ray administered on the same date were normal (Docket No. 13, p. 453 of 731).  On March 14, 2007, the attending physician attributed the chest pain to possible infection or abscess.  A computed tomography (CT) scan of the chest administered on March 14, 2007, showed nonspecific, small mediastinal lymph nodes; otherwise, it

17

was negative (Docket No. 13, p. 451 of 731).  The CT scan of the abdomen and pelvis showed diffuse

fatty infiltration of the liver; otherwise, the results were negative.  Plaintiff was discharged from

EMHRMC on March 15, 2007 (Docket No. 13, pp. 434, 452 of 731).

On April 19, 2007, Plaintiff had a reduction in neck pain but a mild degree of increased

headache pain.  Dr. Shah attempted to alleviate the painful syndrome and continued the current

medication regimen (Docket No. 13, pp. 430-432 of 731).

Dr. Shah completed a MEDICAL SOURCE STATEMENT: PHYSICAL ABILITIES AND LIMITATIONS

on April 27, 2007 and opined that:

1.  Plaintiff could stand at one time for sixty minutes, stand for four hours in an eight-hour day, sit at one time for sixty minutes and sit for four hours in an eight-hour day.

2.  Plaintiff could lift and carry occasionally twenty pounds and lift and carry frequently ten pounds.

3.  Plaintiff could balance frequently, fingering (bilaterally) constantly and handle (bilaterally) constantly.

4.  Plaintiff could occasionally reach, extending the right and left hands and arms in any direction below shoulder level and occasionally tolerate heat, cold, dust, smoke or fumes.

5.  Plaintiff's need to lie down was none to less than one half hour during the eight-hour workday.

6.  Plaintiff's pain was moderate; however, her medications used to maintain may adversely affect her work performance.  The average number of days per month that Plaintiff was likely to be absent was varied due to treatment and levels of pain.

(Docket No. 13, pp. 727-728 of 731).

Dr. Shah conducted muscle testing June 1, 2007.  All muscles tested were within normal limits.

The course of treatment thereafter included a renewal of medications and encouragement to engage

in an exercise routine

Plaintiff reported significant improvement in the degree of headache and neck pain on June

29, 2007.  Her symptoms were well controlled with the medications.  Plaintiff told Dr. Shah that she

was exercising and she was sore when she did not exercise.  On July 26, 2007, Plaintiff explained that

her headache had greatly improved but the pain in her neck had intensified.  Plaintiff reported that both head and neck pain were improved on August 31, 2007 and October 1, 2007 (Docket No. 13, pp. 571, 576, 581, 586, 591 of 731).

After review of the lab data from January 30, 2007 and November 1, 2007, Dr. Belagodun Kantharaj, M. D., an oncologist and internist, diagnosed Plaintiff with fluctuating leukocytosis, or an abnormally large number of cells formed in the myelopoietic, lymphoid, and reticular portions of the reticuloendothelial system in various parts of the body, and normally present in those sites.  Dr. Kantharaj noted that Effexor®, an antidepressant used to treat major depressive disorders and/or steroid nerve blocks had been known to cause or contribute to fluctuating leukocytosis (Docket No. 13, p. 539-540 of 731; www.healthgrades.com/physician/dr-belagodu-kantharaj; STEDMAN'S MEDICAL DICTIONARY, 226430 (27th ed. 2000); PHYSICIAN'S DESK REFERENCE, 2006 WL 390493 (Thomson PDR 2006)).

Plaintiff reported to Dr. Shah on November 28, 2007, that her headache pain had improved but her neck pain had worsened.  On December 28, 2007, Plaintiff reported significant improvement in the degree of head pain but the neck pain had become more intense.  Plaintiff reported on February 26, 2008 and May 21, 2008, that she had a significant increase in head and neck pain (Docket No. 13, pp. 596-597, 603, 622 of 731).

Dr. Moya reported that from June 1, 2007 through November 28, 2007, Plaintiff was prescribed Effexor® (Docket No. 13, p. 549 of 731).  Overlapping in treatment for depression, Dr. Moya monitored Plaintiff's use of a sleep aid and chronic pain management on June 1, 2007, June 6, 2007, July 30, 2007, October 30, 2007, November 13, 2007, November 15, 2007, November 20, 2007, December 3, 2007, December 27, 2007, January 17, 2008, January 29, 2008, February 1, 2008,

19

February 21, 2008, March 3, 2008, April 17, 2008 and April 18, 2008.  Dr. Moya supplemented Plaintiff's routine drug regimen with medications and/or tests used to measure the fluctuation in white blood count, lower cholesterol, avert migraine headaches at the onset and treat an ear infection, sinusitis and knee pain.  Notably, Dr. Moya's diagnostic treatment included:

(1) non specific right hilar and mediastinal lymph nodes and no acute cardiac or pulmonary disease on June 5, 2007;

(2) bilateral standing weight bearing views showed mild joint space reduction on November 1, 2007;

(3) findings from the bilateral mammogram administered on November 1, 2007, showed no suspicious tiny bits of calcium,

(4) diagnostic tests of the results from the magnetic resonance imaging of the right knee administered on November 9, 2007, showed myxoid (resembling mucus) degeneration and small joint space effusion; and

(5) results from the chest X-ray administered on February 1, 2008, were stable.

During the April 17, 2008-visit, Plaintiff was referred to Dr. Diab Almhana, a psychiatrist, to treat the symptoms of depression (Docket No. 13, pp. 520, 523, 528-539, 541-546, 549-569 of 731; STEDMAN'S MEDICAL DICTIONARY, 267170 (27th ed. 2000); www.healthgrades.com/physician/dr-diab-almhana-3xphm).

On May 1, 2008, Dr. Renato D. Querubin, M.D., excised a lesion from Plaintiff's right lower gum (Docket No. 13, pp. 518-519 of 731).

The cervical MRI performed on May 14, 2008, showed the following:

1. C2-3 & C3-4    Normal disc volume, normal spinal canal or neuroforaminal stenosis.
2. C4-5    No disc herniation, spinal canal or left neuroforaminal stenosis.
3. C5-6    Mild central disc bulging results in no spinal canal or neuroforaminal stenosis.
4. C6-C7    Normal disc volumen, no disc herniation, spinal canal or left neuroforaminal stenosis.
5. C7-T1    Normal disc volume, hydration status without disc herniation, spinal canal or neuroforaminal stenosis.

(Docket No. 8, p. 723 of 731).

20

Dr. Moya conducted a medication review on May 2, 2008 and prescribed Lovaza, a triglyceride- reducing drug and continued the prescription for Lovastatin, a cholesterol-lowering agent (Docket No. 13, p. 516 of 731; PHYSICIAN'S DESK REFERENCE, 2006 WL 368879 (Thomson PDR 2006); www.nlm.nih.gov). On June 30, 2008, Dr. Moya prescribed Imitrex, a medication used to treat migraine headaches on June 30, 2008. In addition, results from the:

(1)   thyroid ultrasound were normal;
(2)   lumbar spine X-ray showed minimal arthritic changes without fracture; and
(3)   computed chest with contrast was stable hilar and mediastinal findings.

(Docket No. 13, p. 507, 509, 510. 511 of 731).

On July 3, 2008, Dr. Moya discontinued the prescription for Verapamil, a medication used to treat hypertension. The prescriptions for the sleep aid and morphine sulfate were continued (Docket No. 13, p. 502 of 731).

Dr. Almhana conducted an initial consultation on May 23, 2008, during which he diagnosed Plaintiff with MDD, panic disorder with agoraphobia, obsessive-compulsive personality disorder, and a GAF of 60. A score of 60 essentially identifies a person with moderate symptoms or moderate difficulty in social, occupational, or school functioning (Docket No. 13, pp. 501 of 731).

Dr. Shah administered a cervical epidural steroid injection on June 20, 2008 (Docket No. 13, p. 629 of 731). Plaintiff's headache showed slight improvement and her neck pain was more intense (Docket No. 13, p. 636 of 731).

Because she no longer had medical coverage for her primary care physician who had been prescribing Effexor®, Plaintiff supplemented her care with counseling and psychiatric services at the Nord Center from July 31, 2008 through January 8, 2009. The prescription for Effexor® was approved for central pharmacy on August 2, 2008, September 26, 2008, October 21, 2008 and January 8, 2009.

21

During the course of treatment, sociological stressors were identified, including her residence in an unsafe neighborhood, her mistrust of men, her preference for being a homebody, problems with her son and legal and financial problems.  Plaintiff was referred to the Gathering Hope House, a supportive service to assist people with mental health recovery, for pursuit of her personal growth (Docket No. 8, pp. 645-675 of 731; www.nordcenter.org; www.gatheringhopehouse.com).

On August 14, 2008, Plaintiff presented to Dr. Moya with a complaint that after tapering off of Lyrica®, a pain reliever, she became nauseated and the nausea was compounded by fatigue.  In addition to the usual diagnostic tests, Dr. Moya ordered a CT scan of the head (Docket No. 8, pp. 687-690 of 731; PHYSICIAN'S DESK REFERENCE, 2006 WL 384608 (Thomson PDR 2006)).

On August 18, 2008, Plaintiff presented to Dr. Shah with news that her headache and neck pain were slightly improved.  Plaintiff was progressing well on Topamax® (Docket No. 13, pp. 708-715 of 731).

Dr. Moya discontinued the Lovastatin on October 2, 2008.  The prescriptions for the sleep aid and morphine sulfate were continued (Docket No. 8, p. 683 of 731).

On October 20, 2008, Plaintiff presented to Dr. Shah with increased headache pain.  Dr. Shah reiterated that Topamax® was probably most helpful for the headache pain that Plaintiff generally had; however, it was not as helpful when Plaintiff had a cluster headache (Docket No. 13, pp. 715-722 of 731).  Dr. Shah addressed a significant increase in the severity of pain in Plaintiff's head and neck on December 19, 2008.  All muscles tested were within normal limits.  Two trigger points were identified:  cervical and right upper trapezius (Docket No. 13, pp. 700-707 of 731).

Dr. Moya treated Plaintiff for painful urination on January 15, 2009 (Docket No. 13, pp. 680-682 of 731).  The blood work conducted on January 15, 2009 was negative for elevated glucose levels

(Docket No. 13, p. 679 of 731).

Plaintiff presented to Dr. Shah on February 20, 2009, with generalized complaints of pain primarily in the low back, neck and head.  The muscle testing was within normal limits, her medications were continued and plans were made for further musculoskeletal re-evaluation (Docket No. 13, pp. 692-699 of 731).

### IV.  LEGAL FRAMEWORK FOR EVALUATING DIB CLAIMS

The Commissioner's regulations governing the evaluation of disability for DIB are found at 20 C. F. R. § 404.1520.  *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007).  DIB is available only for those who have a "disability."  *Id.* (*citing* 42 U.S.C. §§ 423(a) and (d), *See also* 20 C. F. R. § 416.920).  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  *Id*. (*citing* 42 U.S.C. § 423(d)(1)(A) (definition used in the DIB context); *See also* 20 C. F.R. § 416.905(a) (same definition used in the SSI context)).  To be entitled to DIB, a claimant must be disabled on or before the date his or her insured status expires.  *Key v. Callahan*, 109 F. 2d 270, 274 (6th Cir. 1997).

To determine disability, the Commissioner has established a five-step sequential evaluation process for disability determinations found at 20 C. F. R. § 404.1520.  *Colvin*, *supra*, 475 F. 3d at 730. First, plaintiff must demonstrate that she is not currently engaged in "substantial gainful activity" at the time she seeks disability benefits.  *Id.* (*citing* [*Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990)].  Second, plaintiff must show that she suffers from a "severe impairment" in order to warrant a finding of disability.  *Id.*  A "severe impairment" is one which "significantly limits ... physical or

mental ability to do basic work activities." *Id*.  Third, if plaintiff is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets a listed impairment, plaintiff is presumed to be disabled regardless of age, education or work experience.  *Id.*  Fourth, if the plaintiff's impairment does not prevent her from doing her past relevant work, plaintiff is not disabled.  *Id.*  For the fifth and final step, even if the plaintiff's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that plaintiff can perform, plaintiff is not disabled.  *Id.* (*citing Heston v. Commissioner of Social Security*, 245 F.3d 525, 534 (6th Cir. 2001) (internal citations omitted) (second alteration in original).  If the Commissioner makes a dispositive finding at any point in the five-step process, the review terminates. *Id.* (*citing* 20 C.F.R. § 404.1520(a)(4); 20 C.F.R. § 416.920(a)(4)).

## V.  THE ALJ'S FINDINGS.

After careful consideration of the medical evidence, the legal framework for establishing disability and the entire record, the ALJ made the following findings:

1.        At step one, Plaintiff met the insured status requirements of the Act through March 31, 2009.  Plaintiff had not engaged in substantial gainful activity during the period from her alleged onset date of August 15, 2006 through the date last insured of March 31, 2009 (20 C.F.R. § 404.1571)

2.        At step two, through the date last insured, Plaintiff had severe impairments: degenerative disc disease, mild degenerative arthritis, fibromyalgia by history, depressive disorder and panic disorder.

3        At step three, through the date last insured, Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

4.        At step four the ALJ considered Plaintiff's residual functional capacity to perform a full range of light work limited to lifting, carrying, pushing and pulling twenty pounds occasionally and ten pounds frequently, sitting for six hours and standing and/or walking for six hours in a normal workday, limited to simple, repetitive tasks, low stress work that did not involve high production quotas, assembly line work or piece rate work.

24

5.    At step five, the ALJ found that Plaintiff was unable to perform any past relevant work. Considering that Plaintiff was 45 years of age, had at least a high school education, was able to communicate in English and had a residual functional capacity to the extent specified in paragraph four above, there were jobs that existed in significant numbers in the national economy that Plaintiff could perform.

6.    In conclusion, Plaintiff was not under a disability, as defined in the Act, through March 31, 2009, the date last insured.

(Docket No. 13, pp. 19-31 of 731).

## V. STANDARD FOR REVIEW.

A district court's review of a final administrative decision of the Commissioner made by an ALJ in a Social Security action is not *de novo*. *Norman v. Astrue,* 694 F. Supp.2d 738, 740 (N. D. Ohio 2010) *report adopted by* 2011 WL 233697 (N. D. Ohio 2011).  Rather, a district court is limited to examining the entire administrative record to determine if the ALJ applied the correct legal standards in reaching his decision and if there is substantial evidence in the record to support his findings. *Id.* (*citing Longworth v. Commissioner of Social Security*, 402 F.3d 591, 595 (6th Cir. 2005)). "Substantial evidence" is evidence that a reasonable mind would accept to support a conclusion. *Id.* (*See Richardson v. Perales*, 91 S. Ct. 1420, 1427 (1971)).

The substantial evidence standard requires more than a scintilla, but less than a preponderance of the evidence. *Id.* at 740-741.  To determine whether substantial evidence exists to support the ALJ's decision, a district court does "not try the case de novo, resolve conflicts in evidence, or decide questions of credibility." *Id.* (*citing Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007)).  Further, a district court must not focus, or base its decision, on a single piece of evidence.  Instead, a court must consider the totality of the evidence on record. *Id.* (*see Allen v. Califano*, 613 F.2d 139 (6th Cir. 1980); *Hephner v. Mathews*, 574 F.2d 359 (6th Cir. 1978)).  In fact, if there is conflicting evidence, a district court generally will defer to the ALJ's findings of fact. *Id.*

The Sixth Circuit instructs that "[t]he substantial evidence standard allows considerable latitude to administrative decision makers. *Id.*  It presupposes that there is a zone of choice within which the decision maker can go either way without interference by the courts." *Id.* (*citing Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (*citing Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)) (emphasis added)).  Accordingly, an ALJ's decision "cannot be overturned if substantial evidence, or even a preponderance of the evidence supports the claimant's position, so long as substantial evidence also supports the conclusion reached by the ALJ." *Id.* (*citing Jones v. Commissioner of Social Security*, 336 F.3d 469, 477 (6th Cir. 2003)).  However, even if an ALJ's decision is supported by substantial evidence, that decision will not be upheld where the Commissioner "fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Id.* (*citing Bowen v. Commissioner of Social Security*, 478 F.3d 742, 746 (6th Cir. 2007)).

## V. PLAINTIFF'S CLAIMS.

Plaintiff seeks reversal and remand pursuant to sentence four of 42 U. S. C. § 405(g) for the reasons that:

1. The ALJ breached his duty to develop the record.
2. The answer to a hypothetical question upon which the ALJ relied is inconsistent with the ALJ's findings.
3. The ALJ failed to accurately evaluate the treating pain specialist's April 2007 opinions.
4. There is a conflict between the jobs the VE suggested that Plaintiff can perform and the jobs in the DOT.

## VI. DEFENDANT'S RESPONSE.

Defendant contends that:

1. Substantial evidence supports the ALJ's finding that Plaintiff had the capacity to perform unskilled, light work, without production quotas.
2. Plaintiff overlooks that the fact that her counsel cross-examined the VE regarding

26

the DOT description as indicating frequent reaching and the VE testified that the DOT was a general description of job requirements. The conflict regarding reaching was resolved by the VE.

3. Plaintiff's argument that the hypothetical question posed to the VE failed to include the precise words "piece rate work" lacks merit.

4. There is no merit to Plaintiff's contention that the ALJ erred in not accepting Dr. Shah's opinions regarding side effects from medication. There is also no merit that the ALJ failed to consider the testimony of the ME.

## VII. ANALYSIS

**1. SHOULD THIS CASE BE REMANDED TO THE COMMISSIONER TO COMPLETE THE RECORD?**
At the supplemental hearing, Plaintiff submitted a written argument prepared by counsel which incorporated excerpts from DOT's occupational group arrangements for bench work occupations such as weld inspector (DOT 7.24.685-014), final inspector (DOT 727.687-054) and gasket inspector (DOT 739.687-102). The ALJ referred to the written argument and attachments as Exhibit 15E when rendering the final decision. Plaintiff argues that the record is incomplete as it does not include the most recent evidence and a remand is warranted to correct the defective record.

Since Exhibit 15E was not made part of the official administrative record, the Magistrate must consider whether the stringent requirements of 20 C. F. R. § 405.301 were met. In the administrative review process, the claimant may examine the evidence used in making the Federal reviewing official's decision, submit evidence, appear at the hearing, and present and question witnesses. 20 C. F. R. § 405.301(c) (Thomson Reuters 2012). The ALJ will issue a decision based on the hearing record, including any new evidence that is timely submitted. 20 C. F. R. § 405.301(c) (Thomson Reuters 2012).

An ALJ may hold a supplemental hearing in order to receive additional evidence consistent with the procedures below. 20 C. F. R. § 405.320 (b) (Thomson Reuters 2012). Specifically, if the claimant wishes to submit evidence at the hearing, the ALJ will accept the evidence if the claimant shows that the administration's action misled the claimant; the claimant had a physical, mental,

27

educational, or linguistic limitation(s) that prevented the claimant from submitting the evidence earlier; or some other unusual, unexpected, or unavoidable circumstance beyond the claimant's control and prevented him or her from submitting the evidence earlier.  20 C. F. R. § 405.331 (b) (Thomson Reuters 2012).

There are only two kinds of remands to the Commissioner permitted in a social security case. *Hollon ex rel. Hollon v. Commissioner of Social Security*, 447 F.3d 477, 483 (6ᵗʰ Cir. 2006).  First, a district court may order a "sentence four" remand after reviewing the Commissioner's decision and entering a judgment, if it determines that a rehearing before the Commissioner is warranted in light of the court's ruling.  *Id.* (*citing Faucher v. Secretary of Health and Human Services,* 17 F. 2d 171, 174 (6ᵗʰ Cir. 1994)).  Second, the district court may order a prejudgment "sentence six" remand, which provides a potential avenue for the relief, namely, the reopening of the administrative record so that the Commissioner may consider "new and material evidence that for good cause was not previously presented to" the Commissioner.  *Id.* (citation omitted).

It is clear from the foregoing, that Plaintiff had a right to submit additional evidence and to ascertain the proper content of the administrative record.  However, the ALJ was not obligated under the rules to accept the evidence because Plaintiff did not show that the administration's action misled the claimant; that she had a physical, mental, educational, or linguistic limitation that prevented her from submitting the evidence earlier; or that there was some other unusual, unexpected, or unavoidable circumstance beyond her control that prevented her from submitting the evidence earlier. Although the Commissioner failed to offer a suitable explanation for why there is no mention of counsel's letter and the copies of the DOT sections undertaken during the hearing, it is clear that the ALJ accepted and considered this evidence in his review of the administrative record.

A sentence four remand is not warranted in light of this finding because there is no reasonable possibility that the written argument and DOT excerpts submitted at the administrative hearing, alone or when considered with the other evidence of record, would affect the outcome of Plaintiff's claim. The written argument is cumulative, mirroring the oral arguments made by counsel to the ALJ during the administrative hearings (Docket No. 13, pp. 70-71; 137-139 of 731).  The ALJ can and did easily access the representative DOT sections.

Alternately, the statute is clear as to the standards that must be met for a sentence six remand for the taking of additional evidence.  Here, a sentence six remand is not a potential avenue for relief sought because the submission at the administrative hearing does not constitute new and material evidence that was not properly presented to the Commissioner.

While it may appear that the ALJ did not accept counsel's letter and exhibit as evidence, the ALJ made explicit findings that counsel's letter and exhibit were considered in determining disability. Under these circumstances, a remand under sentence four or six to incorporate counsel's letter and exhibit into the record is a procedural anomaly.  Since the ALJ already considered counsel's letter and exhibit and the submission is neither new or material, remand for rehearing to officially incorporate counsel's letter and exhibit into the record, will not yield different results.

**2.      DID THE ALJ FAIL TO POSE AN APPROPRIATE HYPOTHETICAL QUESTION TO VE?**

Plaintiff argues that the ALJ failed to include in the hypothetical questions that a consequence of her impairment was that she could not do piece work.  Since the hypothetical question did not accurately reflect a piece work limitation, Plaintiff contends that the VE's answer cannot constitute substantial evidence.

29

The logical underpinnings for the requirements that the hypothetical question posed to the VE must include the claimant's impairments are that without an actual depiction of the limitations, the VE will not be able to accurately access whether jobs do exist for the claimant. *Lamtman v. Commissioner of Social Sec*urity, 2012 WL 2921705, *14 (N.D.Ohio,2012). The hypothetical question posed to a VE for purposes of determining whether a claimant can perform other work should be a complete assessment of the claimant's physical and mental state and should include an accurate portrayal of the claimant's physical and mental impairments. *Id.* (*citing Varley v. Secretary of Health and Human Services*, 820 F.2d 777, 779 (6th Cir.1987); *Myers v. Weinberger*, 514 F.2d 293, 294 (6th Cir.1975) (per curiam)). The hypothetical question should focus on the claimant's overall state. *Id.* It need not include lists of the claimant's medical conditions. *Id.* at 633. An ALJ is only required to incorporate into the hypothetical question, limitations that he or she accepts as credible. *Petro v. Astrue*, 2009 WL 773283, *4 (E.D.Ky.2009) (*citing Sias v. Secretary of Health and Human Services*, 861 F.2d 475, 480 (6th Cir. 1988)).

For the VE's testimony to be reliable, it must take into account limitations or impairments that are medically undisputed and could seriously affect Plaintiff's ability to engage in alternate employment. Piece work is a type of employment that supports performance related pay. It neither focuses on one's abilities nor one's physical and mental impairments. Here, the ALJ properly accounted for Plaintiff's mental and physical limitations that he found to exist on the record, which is all he was bound to do. The ALJ was not required to include a finding that Plaintiff could perform piece work into a hypothetical question posed to the VE.

### 3. PLAINTIFF'S CLAIM THAT THE TREATING PHYSICIAN RULE WAS IMPROPERLY APPLIED.

Plaintiff asserts that the ALJ erroneously (1) gave little weight to the opinions of pain

30

specialist, Dr. Shah, or alternately, explain why such little weight was attributed to Dr. Shah's opinions, (2) rejected Dr. Shah's opinions on Plaintiff's ability to reach; and (3) rejected Dr. Shah's opinions about the side effects from Plaintiff's medications.

    **a.**    **THE TREATING PHYSICIAN RULE**.

    In social security cases involving a claimant's disability, the Commissioner's regulations require that if the opinion of the claimant's treating physician is well-supported by medically acceptable clinical and laboratory diagnostic technique and is not inconsistent with the other substantial evidence in the claimant's case record, it will be given controlling weight. *Johnson v. Commissioner of Social Security*, 652 F. 3d 646, 651 (6th Cir. 2011) (*citing* 20 C. F. R. § 404.1527(d)(2)). "If the opinion of a treating source is not accorded controlling weight, an ALJ must apply certain factors, namely, the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source-in determining what weight to give the opinion." *Hensley v. Astrue*, 573 F.3d 263, 266 (6th Cir. 2009) (*citing Wilson v. Commissioner of Social Security*, 378 F.3d 541, 544 (6th Cir. 2004) (*quoted with approval in Bowen v. Commissioner of Social Security*, 478 F.3d 742, 747 (6th Cir.2007)). Even if the treating physician's opinion is not given controlling weight, "there remains a presumption, albeit a rebuttable one, that the opinion of a treating physician is entitled to great deference." *Id.* (*citing Rogers v. Commissioner of Social Security*, 486 F.3d 234, 242 (6th Cir.2007)). Opinions of specialist with respect to the medical condition at issue are given more weight than a nonspecialist. *Johnson, supra*, (*citing* 20 C. F. R. § 404.1527(d)(5)).

    **1.**    **WEIGHT GIVEN TO DR. SHAH'S OPINIONS GENERALLY.**

It is unequivocal that the ALJ designated Dr. Shah a treating source as the term is defined at 20 C. F. R. § 404.1512(d).  Greater weight was attributed to Dr. Shah's opinions as a whole (Docket No. 13, pp. 24, 25, 26, 27-28 of 731).  While the ALJ can consider all of the evidence presented by Dr. Shah, he need not discuss every piece of evidence related to Dr. Shah's analysis.  Overall, the ALJ gave good reasons for the weight given Dr. Shah's opinions.  Importantly, those good reasons for the weight given the more credible findings were supported by evidence in the case record and were sufficiently specific to make clear to this reviewer the weight given.  When balancing the weight of the evidence, the ALJ was careful to make express, specific findings as to the consistencies with other physicians, particularly, Dr. Moya, also a treating source, and the inconsistencies with Plaintiff's account of her signs and symptoms.  The ALJ stated that he gave weight to Dr. Shah's opinions of Plaintiff's residual functional capacity to the extent that Plaintiff's limitations in lifting and carrying were supported by the weight of the evidence.  The ALJ's apparent rejection of Dr. Shah's expressions of environmental limitations was based on evidence in the record that Plaintiff continued to smoke and she had no breathing-related impairment.  The ALJ also failed to find objective evidence in the record that supported Dr. Shah's statements that Plaintiff needed restrictions when sitting or standing as such statements were not supported by Dr. Shah's own objective clinical or diagnostic findings.

The Magistrate cannot reject the ALJ's succinct, yet well-reasoned findings that support a conclusion that Dr. Shah's opinions were not adopted as a whole where it is apparent that there was no medical evidence to support Dr. Shah's assertions.  The ALJ stated a correct legal standard for conducting the review of Dr. Shah's opinions appropriate for consideration of the objective medical evidence in the record.  Ultimately, the ALJ has good cause to discount Dr. Shah's opinions, in part, assign them little or no weight and attribute more weight to Dr. Shah's opinions that were supported

32

by medically acceptable clinical, laboratory or diagnostic techniques in the record.

      **b**.    WEIGHT GIVEN DR. SHAH'S OPINIONS ON PLAINTIFF'S ABILITY TO REACH.

Plaintiff claims that the ALJ failed to appreciate that she had a cervical spine condition that could cause difficulty reaching.  In fact, the ALJ failed to determine whether controlling weight was owed to Dr. Shah's opinions about reaching.

Plaintiff appears to argue that in all probability, a resulting functional limitation from cervical spinal stenosis and spondylosis is an inability to reach.  The ALJ does not elaborate what he meant by "inability to reach" but he does not ignore the probability that Plaintiff's medially determinable impairments affect her ability.  Instead, the ALJ explains that the records memorializing treatment by Dr. Shah show no evidence of shoulder impingement or other impairment that limits Plaintiff's ability to reach.

Throughout this extensive history of treatment with Dr. Shah, the alleged inability to reach was not corroborated with clinical or diagnostic tests.  Dr. Shah addressed Plaintiff's complaints of arm, back, head, leg and neck pain.  The notes do not even reflect soft tissue shoulder pain.  Dr. Shah conducted neurological testing during each visit and found that generally, Plaintiff's muscles tested within normal limits; that Plaintiff had full thoracic flexion and rotation, no lumbar spine edema or trauma but restricted cervical and lumbar extension and flexion and that the deep tendon reflexes in Plaintiff's biceps and triceps were not within normal limits.  As time progressed Plaintiff had other joint pains that perhaps involved her "tennis elbow" (Docket No. 13, pp. 356, 359, 361, 364-365, 367, 372, 383-385, 422, 424-425, 431-432, 571-572, 575, 577-578, 580, 582-584, 586-587, 589, 595, 597, 600, 603-604, 607-611, 617, 626-629, 633, 636-639, 640, 694, 696, 702-703, 708-709, 712-715, 718-719).  This wealth of treatment notes shows that there was no medically determinable basis on which

33

Dr. Shah could find that Plaintiff was precluded from reaching.        Other evidence makes the ALJ's finding more defensible.  At least once, Plaintiff admitted to Dr. Shah that she swam for exercise (Docket No. 13, p. 585 of 713).  Incidentally, the ALJ did not err in failing to expressly describe a consideration of Plaintiff's limitation regarding overhead work because the ALJ included a limitation for occasional reaching in a hypothetical question posed to the VE (Docket No. 13, pp. 62-63 of 731). In any event, the ALJ has given good reasons for the ultimate weight given Dr. Shah's opinion therefore denoting substantial evidence on which to draw his conclusions and justify his failure to give Dr. Shah's opinions on Plaintiff's ability to reach any weight.

        **c.**      **WEIGHT GIVEN TO DR. SHAH'S OPINIONS ABOUT MEDICATION SIDE EFFECTS.**

The threshold issue here is whether the ALJ failed to consider the side effects of Plaintiff's medications.  Plaintiff identifies the opinions of Dr. Shah and Dr. Goren as showing she suffered from side effects. Hence, Plaintiff's ability to perform work within the limitations of her residual functional capacity are limited by the combined effect of her medication.

An ALJ must consider side effects in the disability decision process.  *See* TITLES II AND XVI: EVALUATION OF SYMPTOMS IN DISABILITY CLAIMS: ASSESSING THE CREDIBILITY OF AN INDIVIDUAL'S STATEMENTS, SSR 96-7p, 1996 WL 374186 (1996); TITLES II AND XVI: ASSESSING RESIDUAL FUNCTIONAL CAPACITY IN INITIAL CLAIMS, SSR 96-8p, 1996 WL 374184 (1996).  For instance, side effects are considered in determining a claimant's residual functional capacity.  *See* SSR 96–8p.  The side effects of medication are also considered in evaluating an individual's credibility about symptoms.  *See* 20 C.F.R. § 404.1529(c)(3)(iv); SSR 96–7p, *supra*.  Although the side effects of any medication taken by a claimant to alleviate her pain or other symptoms is a factor relevant to an ALJ's disability determination, the claimant bears the burden of proving that the claimed medication side effects are

severe enough to impair her ability to work.  *See* 20 C.F.R. §§ 404.1529(c), (d); SSR 96-7p.

The Magistrate acknowledges that Plaintiff was taking some powerful narcotics to manage her symptoms.  Obviously, it would have been necessary to integrate the disabling side effects of a claimant's medication, if any, into the hypothetical question posed to the VE to ascertain if they interfered with Plaintiff's ability to work.  Dr. Shah merely listed Plaintiff's medications in the report and stated that "Morphine, Zanaflex, Vicodin all **may** cause dizziness and drowsiness."  Dr. Shah did not express concern about the side effects of the medication.  Dr. Shah did determine that the effect of the side effects was too speculative to predict if they would result in absences from work (Docket No. 13, p. 728 of 731).

Dr. Goren had a similar reaction.  When asked if at the dosage of morphine sulfate that Plaintiff was being prescribed, would one expect any side effects, Dr. Goren responded:

> A.   I'll make two comments.  Number one, I have not identified any disease in the record for which morphine is the treatment.  Number two, morphine, to put – to use a slang term, is a downer, and can cause drowsiness to a variable degree in various individuals. The same would be true, also, for Vicodin®, Topamax®, and Ambien®, and whatever the muscle relaxer she's taking is.
>
> Q.   Can the combination of those medications cause a decrease in attention or concentration?
>
> A.   **Could**.

(Docket No. 13, pp. 136-137 of 731).

Plaintiff makes a passing suggestion that she is unable to work because she suffers from lethargy and drowsiness when she takes her mediation or medications.  Drs. Shah and Goren concur that there may be side effects from the combination of Plaintiff's medications.  However, the opinions of Drs. Shah and Goren on Plaintiff's medications have little probative value as they do not circumscribe the actual scope of Plaintiff's side effects, whether the side effects alone might be disabling and whether the side effects actually interfered with Plaintiff's ability to perform work as

35

an inspector.  Side effects that do not interfere with Plaintiff's ability to work are properly excluded from consideration by the ALJ.

2.      **PLAINTIFF CANNOT PERFORM THE DOT OCCUPATIONS AS THEY REQUIRE FREQUENT REACHING.**

Plaintiff suggests that the ALJ failed to sustain his burden at step five of the sequential evaluation because all three of the DOT occupations given by the VE require frequent reaching. Plaintiff claims that this is inconsistent with the ALJ's findings that she can engage in occasional, not frequent reaching.  Once the conflict was divulged, Plaintiff claims that the ALJ failed to resolve any conflicts between the DOT occupations and Plaintiff inability to reach.

In making disability determinations, the Social Security Administration (SSADM) relies primarily on the DOT (including its companion publication, the SCO) for information about the requirements of work in the national economy, using these publications at steps four and five of the sequential process.  POLICY INTERPRETATION RULING : TITLES II AND XVI: USE OF VOCATIONAL EXPERT AND VOCATIONAL SPECIALIST EVIDENCE, AND OTHER RELIABLE OCCUPATIONAL INFORMATION IN DISABILITY DECISIONS, SSR 00-4p, 2000 WL 1898704, *2 (December 4, 2000).  The SSADM may also use VEs and VSs at these steps to resolve complex vocational issues although VEs are most often used to provide evidence at a hearing before an ALJ.  *Id.*

Occupational evidence provided by a VE or VS generally should be consistent with the occupational information supplied by the DOT.  *Id.*  When there is an apparent unresolved conflict between VE or VS evidence and the DOT, the adjudicator must elicit a reasonable explanation for the conflict before relying on the VE or VS evidence to support a determination or decision about whether the claimant is disabled.  *Id.*  At the hearings level, as part of the adjudicator's duty to fully develop the record, the adjudicator will inquire, on the record, as to whether or not there is such consistency. *Id.*  Neither the DOT nor the VE or VS evidence automatically "trumps" when there is a conflict.  *Id.*

The adjudicator must resolve the conflict by determining if the explanation given by the VE or VS is reasonable and provides a basis for relying on the VE or VS testimony rather than on the DOT information. *Id.*

In this case, there is a conflict between Plaintiff's perceived inability to reach and the frequent reaching requirements for the positions of gasket inspector, weld inspector and final inspector in DOT. The Magistrate rejects Plaintiff contention that her ability to reach conflicts with the DOT. First, Plaintiff has failed to show a medically determinable basis for an inability to reach. Second, light work does not, by its definition, require that Plaintiff be able to reach overhead. *See* 20 C.F.R. 404.1569a(c)(vi). Third, SSR 00-4p recognizes that the VE might be able to provide his or her own explanation of whether Plaintiff's ability to perform light work could be affected by an inability to reach. Fourth, once the conflict between the DOT jobs and Plaintiff's contention that she could not reach, the VE refined her testimony, reminding Plaintiff that DOT is suggestive, not mandatory and that as she observed the recommended jobs, there was occasional reaching.

Plaintiff's second contention of error fares no better than her first. The VE resolved the disparity between the jobs listed in DOT and Plaintiff's abilities based on her expertise and experience. It was her belief that as they were performed, there was a limited amount of lifting for any of the jobs recommended for Plaintiff. Because Plaintiff had failed to establish a reaching limitation, these jobs were suitable.

The Magistrate finds that there is no apparent conflict with the VE's testimony and Plaintiff did not present evidence establishing that she could not work any type of job that required frequent reaching. Under these conditions, the ALJ did not err by relying on the VE's testimony to resolve any apparent conflicts.

### III.  CONCLUSION

For these reasons, the Magistrate recommends that the Court affirm the Commissioner's decision and terminate the referral to the undersigned Magistrate Judge.


/s/Vernelis K. Armstrong
United States Magistrate Judge


Date:   October 16, 2012


### Iv.  NOTICE FOR REVIEW

Please take notice that as of this date the Magistrate's report and recommendation attached hereto has been filed.  Pursuant to Rule 72.3(b) of the LOCAL RULES FOR NORTHERN DISTRICT OF OHIO, any party may object to the report and recommendations within fourteen (14) days after being served with a copy thereof.  Failure to file a timely objection within the fourteen-day period shall constitute a waiver of subsequent review, absent a showing of good cause for such failure.  The objecting party shall file the written objections with the Clerk of Court, and serve on the Magistrate Judge and all parties, which shall specifically identify the portions of the proposed findings, recommendations, or report to which objection is made and the basis for such objections.  Any party may respond to another party's objections within fourteen days after being served with a copy thereof.

Please be further advised that the Sixth Circuit Court of Appeals, in *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981) held that failure to file a timely objection to a Magistrate's Report and Recommendation foreclosed appeal to the Court of Appeals.  In *Thomas v. Arn*, 106 S. Ct. 466 (1985), the Supreme Court upheld that authority of the Court of Appeals to condition the right of appeal on the filing of timely objections to a Report and Recommendation.